United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>JOSE SERRANO,<br><br>  Defendant.<br>_____ / | No. CR 07-0212 WHA<br><br>**ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL** |

**INTRODUCTION**

After a jury convicted him of possession of crack cocaine with intent to distribute, defendant Jose Serrano moves for a judgment of acquittal pursuant to FRCrP 29(c), and for a new trial pursuant to FRCrP 33. For the following reasons, both motions are **DENIED**.

**STATEMENT**

Defendant was charged with two counts of unlawfully possessing a firearm and ammunition in violation of 18 U.S.C. 922(g), one count of possessing crack cocaine with the intent to distribute in violation of 21 U.S.C. 841(a), and one count of possessing a firearm in furtherance of the drug-trafficking offense in violation of 18 U.S.C. 924(c). He was convicted only on the possession-with-intent charge. The jury hung on all firearm/ammunition charges, the defense having suggested that the police planted the loaded gun on defendant.

Prior to trial, both parties stipulated that defendant possessed a total net quantity of crack cocaine of three grams, including 19 individually wrapped rocks and a separate larger

1  chunk. At trial, the government called expert witnesses and other witnesses who testified to
2  defendant's search and arrest in Franklin Square Park in San Francisco on January 31, 2007,
3  and his prior 2004 sales activity in the same vicinity. Although both trafficking incidents were
4  in the same San Francisco neighborhood, defendant's residence was across the Bay in
5  Richmond.

6  One of these witnesses was San Francisco Police Officer Dion McDonnell. He had
7  conducted surveillance at the park 40–50 times in the past because of numerous complaints
8  about criminal activity (Tr. at 58–59). He stated that, on January 31, 2007, he saw defendant
9  enter the edge of the park. Defendant stood outside a fenced soccer field at a corner of the park
10 for about fifteen minutes, where he had a path of escape and a field of view in multiple
11 directions. The location is shown in the figure below, reproduced from Exhibit 2C.



12 A female approached defendant. He spoke with her for
13 two minutes. She left. Shortly thereafter, a male with a
14 small child approached defendant. They spoke for
15 about three to four minutes (*id*. at 67–69).
16 Defendant was looking in all directions and grabbing
17 something along his right waist side (*id.* at 63, 65).
18 Officer McDonnell suspected that defendant had drugs.
19 He requested assistance from San Francisco Police
20 Officers Stancombe and Steger (*id*. at 70, 83). The two
21 officers arrived. Defendant tried to leave. They stopped and searched defendant, finding the
22 19 rocks of crack cocaine, a blue glove containing a loaded revolver, some cash, and a glass
23 pipe. The pipe had a trace amount of cocaine and lots of methamphetamine residue (*id*. at 108,
24 110, 141, 180–83). Defendant did not appear to be on drugs (*id.* at 118).

25 Pursuant to Rule 404(b), San Francisco Police Officer Edwin Gaffud testified about
26 defendant's 2004 arrest and conviction for possession with intent to distribute powder cocaine.
27 That conduct had occurred in the same vicinity, only a few blocks away. Upon being
28 approached in 2004, defendant had tried to throw away a plastic baggie containing 4.24 grams

2

of cocaine before being apprehended (*id*. at 206–12). Officer Gaffud did not see defendant make a sale or attempt to make a sale (*id*. at 216). In 2004, defendant pled guilty and was convicted of possession with intent to distribute powder cocaine (*id.* at 211–212, 216). Officer Gaffud testified that, when defendant was arrested in 2004, he had a pair of blue gloves (*id.* at 207). When asked about the location, Officer Gaffud answered, "What I did is I paced off the distance between where I arrested Mr. Serrano and a school that was nearby." The government asked what kind of school it was, in order to show "one of the reasons why the defendant — or the witness, excuse me, has such a clear memory of this. He was in fact asked about this in court [in 2004]." Defense counsel objected and the Court sustained the objection and stated to the jury, "The part about the school will be, for the time being, stricken and is disregarded by the jury" (*id.* at 210–11).

A key issue in the trial was the custom and usage of street drug dealers versus mere users. A government witness was Police Inspector Gavin McEachern of the San Francisco Police Department, who testified to the "typical" behavior of drug dealers and users (*id*. at 330–36, 344). He testified that a normal seller of crack cocaine in the Mission District in San Francisco would typically possess a quantity of drugs that "could be in excess of what I consider to be personal use," some packaging material, money, weapons, and a cell phone (*id*. at 329–30). The typical seller might carry a weapon for protection from rival drug dealers, dissatisfied customers, or encounters with police. Drug dealers will loiter in a specific area for a certain period of time, *e.g.,* for ten to twenty minutes. They will "engage people in the street in small conversation" (*id.* at 330–331). He later stated that he had never arrested a known mere user of crack cocaine who had more than four or five rocks of crack cocaine on him or her *(i.d.* at 332–33). Inspector McEachern said that a recreational user might have one to three or four rocks in his or her possession and smoke a gram or a gram-and-a-half of crack cocaine a day. But he "wouldn't expect a user to have 10 or 15 or 20 rocks at one time." He admitted that addicts who were using a gram and a half or two grams of crack cocaine a day could buy it in bulk if they had the money to do so (*id.* at 334). Inspector McEachern confirmed that he did not use any methodology regarding what drug dealers and drug users "typically" did, aside from

3

1 his own experience in arresting or encountering them. He said that he probably made
2 occasional mistakes but did not know how often he made them. He estimated that his error rate
3 was between three to five percent (*id*. at 334, 346, 347).

4 Defense witness Lieutenant Kitt Crenshaw of the San Francisco Police Department
5 testified that, in his experience, the most crack cocaine that a heavy user could smoke in a
6 single day was seven grams, while a typical amount was two to three grams (or "20 to 30
7 rocks") (*id*. at 438–39). He said that, to determine whether drugs were possessed for sale as
8 opposed to personal use, he considered "the totality of the case, the individual, the
9 circumstances, if there was any other factors involved, money, gun, paraphernalia, scale, the
10 activity of the individual." These factors included whether each rock was individually
11 packaged, the person's conduct, and location (*id.* at 442).

12 Defendant called his sister Paula Cardenas to testify that defendant was using drugs
13 "almost every day" and had seen him smoking drugs in a pipe like the one found on his person
14 on the day of his arrest. Ms. Cardenas said that no one had ever come to search defendant's
15 residence and she was unaware of any drug dealing there (*id*. at 457–60). Defendant's uncle
16 Francisco Serrano testified that defendant sometimes worked at Mr. Serrano's bakery,
17 thereby obtaining some funds to buy drugs (without necessarily having to sell them) (*id*. at 471).

18                                     \*          \*          \*

19 At pretrial, the Court sustained defendant's objection to any references to defendant's
20 alleged gang affiliation. The purpose was to avoid suggesting to the jury that defendant was a
21 member of a gang. Defendant claims that nonetheless there were repeated references to
22 defendant's alleged gang affiliation. The first government witness, Officer McDonnell, testified
23 to being "currently assigned to the gang task force" (Tr. 57). The government then asked
24 "what did you do before you were assigned to the gang task force," to which Officer McDonnell
25 replied, "I worked at the mission Station plain-clothes unit, the gang unit" (*ibid*.).
26 Defense counsel did not object at the time or ask to strike the testimony. Defense counsel later
27 objected, however, when Officer McDonnell testified that the police had received "numerous
28 complaints regarding the activity up there [in Franklin Square Park], drinking, drug dealing,

4

United States District Court
For the Northern District of California

1  gang activity" (*id*. at 58).  When defense counsel objected, the Court immediately struck the
2  reference and the government confirmed that gang activity was not relevant to the case.
3  The Court stated, "[T]hat's all background, and no harm has been done" (*id.* at 58–59).
4  On a different point, the government argued that the loaded gun found in the blue glove must
5  have belonged to defendant since he had had a blue glove as well during the 2004 incident.
6  The defense now claims this was an indirect reference to gang membership.  Finally, during
7  closing arguments, the prosecutor said, "And there can be no reasonable doubt that [defendant]
8  was carrying a loaded revolver to help protect himself in his efforts dealing those drugs,
9  to protect himself from rival gang members, from dissatisfied customers."  Upon defense
10 counsel's objection, the government corrected itself, "Excuse me, Your Honor, I misspoke,
11 Mr. Blank is absolutely correct."  The Court admonished the jury, "Wait, wait.  There are —
12 all right, the gang part, ignore that.  See, right away, Ms. Martin, you got carried away.
13 And there is nothing in this case about gangs.  She meant to say rival drug dealers" (*id.* at 484).
14         Before trial, the Court excluded evidence relevant only to show defendant was on
15 parole.  Officer Gaffud, however, revealed in his testimony, "After I conducted my search and
16 after I — or after I verified that he was still on active parole and I – after I conducted my search
17 of his person, then I retrieved the object that was thrown in the street" (*id.* 208).  Defense
18 counsel did not object and ask to strike the testimony.  During jury deliberations, moreover, a
19 police report that referred to defendant's parole status that had not been admitted into evidence
20 at trial was found inside a government evidence envelope sent to the jury room.  Upon
21 discovery, three jurors admitted that they had read the report (Blank Decl. ¶ 2).  On
22 supplemental voir dire, the three jurors stated categorically that they would ignore the report
23 and not discuss it with the other jurors.  This occurred before any verdict.  Defendant initially
24 moved for a mistrial, but, perhaps anticipating a favorable outcome, expressly withdrew his
25 motion and the jury continued to deliberate.

5

# ANALYSIS

## 1. MOTION FOR A JUDGMENT OF ACQUITTAL.

### A. Legal Standard.

In ruling on a motion under FRCrP 29, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) (internal citation omitted). "[A] district court must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *Ibid* (citation omitted in original). "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992). Defendant argues that the Court here should enter a judgment of acquittal on all counts, including the one count of conviction and three counts on which the jury could not reach a verdict.

### B. Counts One and Two: Interstate Travel of Firearms And Ammunition.

The jury hung on all counts involving the firearm and ammunition. With respect to Count One, felon in possession of a firearm, defendant renews his objection that the records relied upon by the ATF agent, which purported to show that the loaded firearm crossed state lines, were inadmissible hearsay. The Court had tentatively granted defendant's motion to exclude firearm-shipment expert testimony until the government laid a proper foundation. Following an evidentiary hearing on July 2, 2007, the Court determined that the records were admissible pursuant to the public records hearsay exception or, alternatively, the residual hearsay exception. This order adopts its earlier conclusion that the records and testimony were properly admitted. Based on the records required to be submitted to the agency, the ATF agent testified to the identification and movement of the firearm, from which the jury could reasonably have concluded that the firearm crossed state lines. Given the properly admitted evidence, a rational trier of fact could have found beyond a reasonable doubt that the firearm

met the jurisdictional requirements. The motion for acquittal, therefore, must be **DENIED**, and the government is free to re-try this count.

For Count Two, felon in possession of ammunition, defendant likewise renews his prior motion for judgment of acquittal on the interstate-travel element. Again, he argues that there was insufficient evidence to find beyond a reasonable doubt that the ammunition moved across state lines because the ammunition was described in the indictment as "cartridges," and there was no specific evidence that the cartridges moved in interstate commerce. The Court's July 5 order has already addressed this issue. It stated that "[t]he fact that the indictment specified 'cartridges' is of no moment. The Ninth Circuit has recently held that language in an indictment specifying a particular gun in a count charging the use of a firearm is mere surplusage." *See United States v. Hartz*, 458 F.3d 1011, 1019–22( 9th Cir. 2006). The Court denied the defendant's FRCrP 29 motion regarding Count Two of the indictment. Based on his training and experience, the ATF agent then testified that the markings on the cartridge's headstamp indicated that the ammunition was manufactured in Arkansas. Again, there was sufficient evidence such that a rational trier of fact could find beyond a reasonable doubt that the cartridges were assembled in a plant in Arkansas and therefore crossed state lines. The motion is **DENIED** and the government is free to re-try this count.

### C.     Counts Three and Four:  Intent to Distribute Crack Cocaine.

Defendant argues that no rational jury could have found beyond a reasonable doubt that defendant intended to distribute crack cocaine, an essential element under 28 U.S.C. 841(a). Specifically, he points to the insufficiency of "the only potential evidence of intent to distribute" — the stipulated quantity of drugs possessed by defendant, the testimony of Inspector McEachern, and his prior conviction in 2004. The Court finds that defendant's arguments have no merit, especially after viewing the evidence in the light most favorable to the prosecution.

Defendant argues that three grams of drugs are not enough to infer an intent to distribute narcotics; when the quantity is three grams or so, defense counsel insists that there must also be *direct* evidence of intent to sell (*e.g.,* a sale or confession). To support this proposition,

7

defendant cites *United States v. Lopez,* 477 F.3d 1110, 1114 (9th Cir. 2007), which stated, "[W]here there is 'other evidence of a plan or intent to distribute,' this court has held that possession of as little as four or five grams may establish an intent to distribute cocaine." *Lopez* cited *United States v. Ramirez*, 608 F.2d 1261, 1264–65 (9th Cir. 1979), which stated, "[W]here there is other evidence of a plan or intent to distribute, possession of as small a quantity as 4 or 5 grams is sufficient to establish an intent to distribute cocaine. In the instant case, there is *direct evidence* that appellant engaged in the 'distribution' of cocaine" (internal citations omitted) (emphasis added). From these decisions, defense counsel say that *circumstantial* evidence cannot support an inference of intent to distribute when only three grams are found because, when circumstantial evidence is amenable to both an innocent and guilty interpretation, the jury must give defendant benefit of the innocent interpretation. *See Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1118 (9th Cir. 2005).

This order rejects defense counsel's argument. The above-cited decisions do not actually hold that circumstantial evidence will not suffice. Issues of mental intent, moreover, are rarely susceptible to direct proof. They must usually be proven through circumstantial evidence. *See, e.g., United States v. Rasheed*, 663 F.2d 843, 848 (1981) (holding that fraudulent intent may be, and often must be, proven by circumstantial evidence).

Here, viewing the circumstantial evidence as an integrated whole rather than piecemeal in the light most favorable to support the verdict, a jury could reasonably have found that the *accumulated force* of the circumstantial evidence proved the intent element beyond a reasonable doubt. On his person and at the ready, defendant had 19 individually wrapped rocks of crack cocaine. The 19 rocks was greater than normally needed for immediate personal use. Nothing in the trial record showed that defendant had just purchased the 19 rocks or that he had a habit so large that he would carry 19 rocks on his person. Had he been such a heavy user, he would be highly likely to be under constant influence of drugs, yet police officers testified that defendant did not appear to be under the influence of drugs. He engaged in behavior common to a "typical" drug dealer; for about fifteen minutes, he stationed himself in an open, strategic location known as a place to buy and sell drugs that was amenable to easy escape (see exhibit

1 above). If his intent had been to use the drugs, he would have found a more private location.
2 He engaged passers-by in brief conversations. And, he was back in the same neighborhood
3 where he sold drugs in 2004, using the same modus operandi. He was found with a loaded
4 handgun, often used by drug dealers against rival drug dealers. The jury could have found that
5 defendant had possession of the loaded firearm even if did not reach a verdict on Counts One,
6 Two, and Four. With respect to Counts One and Two, the jury might have remained
7 unpersuaded because the interstate evidence was contested during trial. (With respect to
8 Count Four, the jury might have disagreed over whether or not the firearm was being used to
9 further drug trafficking.)

10 The defense claims that the expert testimony by Inspector McEachern was insufficient,
11 citing *United States v. Skipper*, 74 F.3d 608, 611 (5th Cir. 1996) (reversing conviction for
12 possession of 2.89 grams of crack cocaine found in a small plastic bag with intent to distribute
13 due to insufficient evidence of intent, despite the government introducing some testimony
14 indicating this amount of drugs could suggest drug dealing). That Fifth Circuit prosecution,
15 however, had little supporting evidence other than a straight-edge razor found in the defendant's
16 car. Inspector McEachern testified to the behavior of "typical" drug dealers. Here, a juror
17 could draw reasonable inferences from the facts. According to Inspector McEachern, typical
18 drug dealers have larger quantities of drugs (*i.e.,* more than two grams per day) in individual
19 packages wrapped for sale and occasionally carry weapons.

20 Defendant tries to discount the import of the loaded gun evidence by citing
21 *United States v. Hunt*, 129 F.3d 739, 741–42 (5th Cir. 1997), where the Fifth Circuit reversed a
22 conviction for possession of crack cocaine with intent to distribute on the grounds that the
23 evidence was insufficient to show that defendant had the requisite intent, even though he
24 possessed almost eight grams of crack, drug paraphernalia, and a loaded handgun. *Hunt* is
25 distinguishable because the handgun there had been found under the couch. Here, defendant's
26 loaded revolver was found on his person or so a jury could have concluded.

27 The evidence of the prior conviction was also probative. This evidence was admitted for
28 the limited purpose of showing Rule 404(b) factors, such as the defendant's intent and modus

9

operandi. In the 2004 arrest, defendant had pled guilty to possession with intent to distribute powder cocaine. Like the instant case, defendant had only a few grams of drugs (4.24 grams in the 2004 conviction). Defendant also had blue gloves in 2004. Defendant argues that evidence of previous drug trafficking is not necessarily probative of an intent to distribute the drugs in the defendant's possession, citing *Turner v. United States*, 396 U.S. 398, 423 (1970) ("[The] bare possession of cocaine is an insufficient predicate for concluding that Turner was dispensing or distributing"). *Turner* was dissimilar from the current situation because there was no actual prior conviction in that fact pattern. And stating that the "bare possession of cocaine is an insufficient predicate" is very different from stating "previous drug trafficking is not necessarily probative of an intent to distribute," as defense counsel portrays *Turner*.

Contrary to the defense, the three items were *not* the only incriminating evidence of intent to distribute. This bears emphasis. As discussed earlier, defendant possessed individually wrapped rocks of crack cocaine. He was not under the influence of the drugs. He had not been seen using the drugs or buying any drugs. His pipe only held trace amounts of cocaine but lots of methamphetamine residue. He had a loaded weapon, wrapped in a blue glove similar to blue gloves found on his person when he was arrested in 2004. He was in the same locale where he had been caught selling cocaine in 2004, a locale many miles from his residence across the Bay. Given the accumulated force of all the circumstantial evidence, particularly when viewed in the light most favorable to the prosecution, a rational jury could find beyond a reasonable doubt that defendant intended to distribute the drugs.

**2.     MOTION FOR A NEW TRIAL.**

**A.     Legal Standard.**

Under FRCrP 33, a trial judge may vacate a judgment and grant a new trial if the interest of justice so requires. The decision to grant a new trial lies within the trial judge's discretion. *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984). The trial judge does not need to "view the evidence in the light most favorable to the verdict; it may weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000). A motion for new trial, however, should be granted only in those

10

1  exceptional circumstances in which the evidence preponderates heavily against the verdict.
2  *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981).

3  Furthermore, if there was some inadmissible evidence and the trial judge issued curative
4  instructions, "[w]e assume that juries follow admonitions and curative instructions.
5  As we indicated in *Johnson*, we weigh the force and delivery of the instruction against the
6  prejudice generated by the evidence. To determine the prejudice, we compare the probative
7  force of the inadmissible evidence with that of the admissible evidence that supports the verdict.
8  The trial judge's determination of the prejudicial impact of evidence must be accorded
9  deference." *United States v. Nolan*, 700 F.2d 479, 485 (9th Cir. 1983) (internal citations
10 omitted). *See also Tak Sun Tan*, 413 F.3d at 1115 ("[W]e presume jurors follow the court's
11 instructions absent extraordinary situations").

### B. Effect of the Evidence.

As stated, the defense claims that the government made improper references to defendant's alleged gang affiliation, parole status, and 2004 conviction. The Court finds that the circumstances were not sufficiently exceptional to warrant a new trial. Moreover, in some of these incidents, the Court had issued curative instructions that were presumed to have been followed by the jury. Some of the alleged misconduct was not misconduct at all and is merely far-fetched exaggeration by defense counsel.

#### *(1) Evidence Referring to Gang Affiliation.*

The defense argues that the government made repeated improper references to defendant's alleged gang affiliation. The Ninth Circuit has stated, "Our cases make it clear that evidence relating to gang involvement will almost always be prejudicial and will constitute reversible error." *Kennedy v. Lockyer*, 379 F.3d 1041, 1055 (9th Cir. 2004). "A defendant's guilt may not be proven by associating him with unsavory characters." *United States v. Dickens*, 775 F.2d 1056, 1058 (9th Cir. 1985). The Court finds that the references here were not improper and any potential harm was cured by instructions.

*First*, the fact that Officer McDonnell worked in the gang task force came out merely as part of a recitation of his employment history. There was zero suggestion that defendant was a

11

gang member. If the Court were to follow defendant's logic on this claim, then every officer's employment experience would be off limits. For example, the testimony of a homicide detective would imply that an accused committed murder, or the testimony of an officer now in a child-molestation unit would supposedly imply that the defendant was a pervert. This argument is ridiculous and gives the jury no credit for intelligence.

*Second*, Officer McDonnell said that the police had received numerous complaints regarding activity in Franklin Square Park, including gang activity. This was *not* a claim that *defendant* was in a gang. Nonetheless, defense counsel objected and the Court struck the reference to gang activity. The government confirmed that gang activity was not relevant to the case. The Court then stated to the jury: "[T]hat's all background, and no harm has been done."

*Third*, defendant objects to the government's reliance on the color of the blue glove, which allegedly suggested defendant was a member of a gang that sported blue gloves. No evidence or argument was presented to show the link between a blue glove and any gang affiliation. It would be a leap to presume jurors made any such connection. Instead, references to the blue glove were entirely proper as part of the government's attempt to show that defendant had the loaded gun, contrary to the insinuation that it was planted by the officers. Blue was the same color as defendant's glove in the 2004 incident. The fact that the loaded gun was in a like glove showed that defendant was in possession of the gun, contrary to the defense suggestion. This did not violate the pretrial order and was entirely proper mode of proof.

*Fourth*, the government said during closing arguments, "And there can be no reasonable doubt that he was carrying a loaded revolver to help protect himself in his efforts dealing those drugs, to protect himself from rival gang members, from dissatisfied customers." Defense counsel promptly objected. The government immediately corrected itself and said that she had "misspoke." The Court admonished the jury, "Wait, wait. There are — all right, the gang part, ignore that. See, right away, Ms. Martin, you got carried away. And there is nothing in this case about gangs. She meant to say rival drug dealers." In the Court's judgment, this misspoken allusion to "rival gang members" rather than rival drug dealers was curable and was, in fact, cured by the Court's admonition.

12

### *(2)   Evidence Referring to Parole Status.*

The defense also argues that the government improperly referred to defendant's parole status. Officer Gaffud testified, "After I conducted my search and after I — or after I verified that he was still on active parole and I — after I conducted my search of his person, then I retrieved the object that was thrown in the street." Defendant did not object. Even though the Court had ruled to exclude the parole evidence, the jury legitimately learned that defendant had at least one prior conviction because his 2004 conduct, after vetting by the Court, had been admitted under Rule 404(b). Defendant himself stipulated, moreover, to having been convicted of a crime punishable by a term of imprisonment exceeding one year. That alone implicated a probable parole status.

With respect to the police report that accidentally ended up in the jury room, the Court promptly contained the problem and gave a curative instruction. On supplemental voir dire, the three jurors who had read the police report stated that they would not discuss it with the other jurors and they would continue deliberating without considering the report. At all events, defendant had initially moved for a mistrial but, perhaps anticipating a favorable outcome, expressly withdrew the motion and the jury continued to deliberate. It is sandbagging to have waived the point only to bring it up now. At all events, this minor glitch did not rise to the level of "exceptional circumstances." There was no prejudice to defendant.

### *(3)   Evidence Referring to 2004 Conviction.*

The defendant finally argues that the government made improper use of defendant's 2004 conviction, which had been admitted into evidence for the limited purposes of showing intent and modus operandi. The defense claims that the government used the 2004 prior conviction to introduce highly prejudicial testimony regarding defendant's alleged gang affiliation and parole status. Defendant also alleges that the government "introduced deliberately inflammatory testimony that Mr. Serrano was allegedly nearby a school when he possessed the drugs for sale in the 2004 case" (Def. Rule 33 Br. at 10). The Court has already addressed the references to gang affiliation and parole status in this order. It found no prejudicial impact and the jury is presumed to have followed curative instructions. The Court

also finds that the testimony regarding a school was extraneous and inconsequential, given that it had nothing to do with the facts in this case. Furthermore, defense counsel objected and the Court immediately issued curative instructions, stating, "The part about the school will be, for the time being, stricken and disregarded by the jury."

In sum, the evidence does not preponderate heavily against the verdict such that a serious miscarriage of justice may have occurred. The circumstances were not sufficiently exceptional to warrant a new trial.

## CONCLUSION

For the reasons stated above, defendant's motion for judgment of acquittal and his motion for a new trial are **DENIED**.

**IT IS SO ORDERED.**

Dated: October 11, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE